#24291-a-ECKRICH, Circuit Judge
**2008 SD 12**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

FIRST NATIONAL BANK OF FT. PIERRE,                Intervenor and Appellant,

v.

SOUTH DAKOTA STATE BANKING
COMMISSION, DEPARTMENT OF
COMMERCE AND REGULATION,
DIVISION OF BANKING,

and

FIRST WESTERN BANK STURGIS,                Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE MAX A. GORS
Judge

\* \* \* \*

BRAD A. SINCLAIR of
Serkland Law Firm
Fargo, North Dakota

FRANK L. FARRAR
Britton, South Dakota

RANDALL B. TURNER
Aberdeen, South Dakota                Attorneys for Appellant.

GERALD P. LAUGHLIN
JOHN S. ZEILINGER of
Baird Holm LLP
Omaha, Nebraska

THOMAS E. LEE of
Schmidt, Schroyer, Moreno, Lee & Bachand
Pierre, South Dakota                Attorneys for appellee.

\* \* \* \*

ARGUED
OCTOBER 3, 2007

OPINION FILED 2/13/08

#24291

ECKRICH, Circuit Judge

[¶1.] The South Dakota State Banking Commission, Department of Commerce and Regulation, Division of Banking (Commission) approved an application by First Western Bank, Sturgis (First Western) to establish a branch bank in Lead, South Dakota. The circuit court affirmed Commission's decision. First National Bank of Ft. Pierre (First National) appeals.

[¶2.] We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶3.] The Commission is an administrative agency under the direction and supervision of the Department of Revenue and Regulation. SDCL 51A-2-2. Its duties include reviewing, investigating and approving or disapproving applications to establish branch banks. SDCL 51A-3-9; SDCL 51A-3-10; SDCL 51A-3-11.

[¶4.] First National operates a branch bank in Lead, South Dakota. First Western operates a branch bank in two locations in Deadwood, South Dakota. Wells Fargo Bank operates a branch bank in Lead. First Western applied to establish a branch bank in Lead to better serve its existing customers and attract new business.

[¶5.] First Western's application obligated the Commission's Director to perform a mandatory investigation and report upon the following:

> (1) The character, reputation and financial standing of the organizers or incorporators and their motives in seeking to organize the proposed state bank;

> (2) The character, financial responsibility, business experience and standing in the community of the prospective stockholders and of those proposed as directors of the bank;

(3)    The need in the community where the bank would be located for banking or banking and trust facilities, or additional banking or banking and trust facilities as the case may be;

(4)    The ability of the community to support the proposed bank, giving consideration to:

(a)  The competition offered by existing banks;

(b)  The banking history of the community;

(c)  The opportunities for profitable employment of bank funds as indicated by the average demand for credit, the number of potential depositors, the volume of bank transactions, and the business and industries of the community, with particular regard for their stability, diversification and size; and

(d)  If the bank is to exercise trust powers, the opportunities for profitable employment of fiduciary services;

(5)    Such other facts and circumstances bearing on the proposed bank and its relation to the community as in the opinion of the director or the commission may be relevant;

(6)    The adequacy of the capital structure of the proposed bank in relation to the amount of the anticipated business of the bank and the safety of prospective depositors.

SDCL 51A-3-9.

[¶6.]       The Director's report was forwarded to the Commission for its consideration. The Commission consists of five members appointed by the Governor. By law three Commission members must be officers or directors of a state or national bank. SDCL 51A-2-7. In this case, one of the Commission members, Paul Christen, recused himself because he and his wife have an interest

in First Western.[1]  The Commission thereafter conducted the proceedings as a four-person body.  SDCL 51A-2-11.

[¶7.]        The Commission has the statutory duty to investigate First Western's branch bank application, conduct a hearing, propose findings of fact, conclusions of law and after considering "the director's findings and recommendations and all other available relevant information . . . in its discretion approve or disapprove the application."  SDCL 51A-3-10; SDCL 51A-3-11.

[¶8.]        First National intervened and objected to First Western's application.  The Commission conducted a contested hearing, heard lay and expert testimony, and received other evidence from both First Western and First National.  Ultimately, the Commission voted to approve First Western's application.  The circuit court affirmed this decision.

[¶9.]        First National appeals, raising two issues:

> Whether the Commission's decision to approve the application of First Western was clearly erroneous.
>
> Whether the Commission's failure, as a body, to recuse itself led to an unacceptable risk of bias.

## STANDARD OF REVIEW

[¶10.]        Our review of an administrative decision is controlled by SDCL 1-26-37.  Kuhle v. Lecy Chiropractic, 2006 SD 16, ¶15, 711 NW2d 244, 247.  "When a circuit court has reviewed an administrative agency's decision, we review the agency's decision unaided by any presumption that the circuit court's decision was correct."  Meligan v. Dept. of Revenue and Regulation, 2006 SD 26, ¶13, 712 NW2d

---

1.    Paul Christen and his wife are the majority stockholders of the holding
      company which owns First Western Bank.

12, 17. The agency's factual findings, including credibility determinations, are reviewed under the clearly erroneous standard. *Kuhle*, 2006 SD 16, ¶15, 711 NW2d at 247. We will reverse those findings only if we are definitely and firmly convinced a mistake has been made. *Id.* Questions of law are reviewed de novo. Pauley v. Simonson*, 2006 SD 73, ¶7, 720 NW2d 665, 667.

FACTS

[¶11.]      Lead and Deadwood, "twin cities" geographically separated by mountain and valley, share common social, economic, educational and cultural features. The cities are not, however, identical twins. In recent history, their economic dissimilarities have grown more pronounced.

[¶12.]      The advent of legalized gambling in the late 1980s brought dramatic growth to Deadwood. Deadwood caters to the gaming-tourist market. Often, especially during the summer, tourists crowd the streets and sidewalks of Deadwood. Commercial rooflines echo the rising casino trade rather than retail trade. Deadwood's business investment and bank deposits reflect the pervasive influence of the gambling industry. Residential housing is scarce. Its workforce greatly exceeds its population.

[¶13.]      On the other hand, during the rise of Deadwood's economic fortunes, Lead's economic prospects fell. Homestake Gold Mine, once the largest employer and landowner in Lead, shuttered its mine and moved out. Jobs were lost, Lead's population declined, businesses closed, and sales tax receipts declined. Multi-year highway construction on major highway arteries serving Lead limited access to this mountaintop town.

[¶14.]     The Commission, after receiving evidence, hearing both lay and expert testimony, and considering the Commission Director's report, found that Lead's present economy and future prospects now appear brighter. Homestake real property is now available on the market. Homeowners, once captive to renting Homestake-owned residences and having no economic incentive to maintain their dwellings, are now investing in their homes. Substantial residential developments are underway in or in proximity to Lead.

[¶15.]     The State of South Dakota has committed approximately $33,000,000 to converting the former Homestake Mine into an underground science lab. Lead is at the center of outdoor recreational activities given its proximity to the Mickelson Trail, cross-country and snowmobile trails, and ski slopes.

[¶16.]     Deadwood's shortage of residential housing has been Lead's gain. Many people work in Deadwood but live in Lead. Twenty-eight new businesses or business owners have been added to Lead since 2003. Lead sales tax receipts have increased since 2003.

[¶17.]     Since 2000 First Western Bank's Deadwood branch originated approximately nine million dollars in loans and two million dollars in deposits from First Western customers in the Lead zip code. Overall, the Lawrence County economy is strong.

[¶18.]     In other words, the Commission was presented with evidence to support its finding that First Western's Lead customers would experience better customer service, Lead's economic downturn is over, the business prospects are bright, and a need exists for a First Western branch bank in Lead.

ANALYSIS

[¶19.]     The Commission's discretion to disapprove a branch bank is not unfettered.  Its findings of fact are subject to "clearly erroneous" judicial review. *Kuhle*, 2006 SD 16, ¶15, 711 NW2d at 247.  Additionally, SDCL 51A-3-9 requires the Commission to consider various statutory factors including the need for the branch bank in Lead, the ability of the community to support it, the competition, the banking history, average demand for credit, number of potential depositors, transaction volume and the businesses and industries of the community with particular regard for their stability, diversification and size.

[¶20.]     "The statutory requirement is for the Commission to consider each of the factors in arriving at a decision based on the evidence as a whole."  Application of American State Bank, Pierre, 254 NW2d 151, 153 (SD 1977).

[¶21.]     Much of the evidence presented came through expert testimony proffered by both First Western and First National.  The respective experts gave conflicting opinions.  First National's expert, Randy Steuffen, opined there was "no call for entry" for another bank in Lead.  First Western's expert, Dean Coddington, concluded the proposed branch "will serve a public need and advantage for the City of Lead. . . .  Existing residents and businesses will have a third alternative for placing their deposits and obtaining credit . . . the new branch will provide more convenient access for the relatively large number of First Western customers already living in Lead."

[¶22.]     First Western's other expert, John Danforth, is a past senior vice-president and director of research for the Federal Reserve Bank of Minneapolis.

His responsibilities included overseeing competitive analysis of bank mergers and acquisitions. Danforth testified solely to identify errors in Steuffen's data calculations and methodology.

[¶23.]       Steuffen utilized an analytical tool called the Herfindahl-Hirschman Index (HHI) to opine there was no "call for entry" into the Lead branch. The HHI is used by the Federal Trade Commission agencies and the U.S. Department of Justice to assess the impacts of mergers on market concentration. Danforth provided evidence that:

> The HHI was not designed to be used in assessing the need or absence of need for additional banking facilities in a given area and, to the best of my knowledge and belief, there is no economic analysis to suggest that the Herfindahl-Hirschman Index provides any useful information regarding the need or absence of need for additional banking offices in the area for which this index is calculated.

Danforth identified other errors including Steuffen's consistent miscalculation of the HHI.

[¶24.]       Commission found Steuffen to be a less credible witness than Danforth, and his use of the HHI misleading. Commission was certainly entitled to make this credibility finding and based upon our review of the record we cannot say that it was clearly erroneous. *Kuhle*, 2006 SD 16, ¶15, 711 NW2d at 247. In fact, our review of the record shows that Commission considered all of the statutory factors in making its decision. Moreover, its decision was backed by sufficient evidence, such that we are not definitely and firmly convinced a mistake has been made. *Id.* Commission's decision is neither clearly erroneous nor an abuse of discretion.

#24291

[¶25.]    First National's second issue, Commission bias, is without merit. First National failed to object to the composition of the Commission during the administrative proceedings. "It is well settled that if objections are not raised before the administrative agency at the hearing, they are not preserved for appeal." Matter of State of S.D. Water Management Board Approving Water Permit No. 1791-2, 351 NW2d 119, 122 (SD 1984).

[¶26.]    We affirm the order of the circuit court.

[¶27.]    GILBERTSON, Chief Justice, and SABERS, KONENKAMP and MEIERHENRY, Justices, concur.

[¶28.]    ECKRICH, Circuit Judge, for ZINTER, Justice, disqualified.